729 So.2d 1112 (1999)
Virginia Gail EDWARDS, et al., PlaintiffsAppellees,
v.
Edward M. DAUGHERTY, et al., DefendantsAppellants.
No. 97-1542.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1999.
Rehearing Denied April 14, 1999.
*1116 Clayton Arthur Larsh Davis, Reuvan Nathan Rougeau, Samuel B. Gabb, Lake Charles, for Virginia Gail Edwards etc.
Michael Steven Beverung, Lake Charles, Robert E. Morgan, David Wooley, for Wayne McElveen Sheriff of Cacasieu Parish.
David Ross Frohn, Lake Charles, Harry Alston Johnson III, Elizabeth Broooks Hollins, Lake Charles, for Sphere Drake Ins. Co.
BEFORE: YELVERTON, COOKS and SULLIVAN, Judges.
COOKS, Judge.
On December 22, 1993, Sissy Woodard was traveling south on Davis Road just north of Westlake, Louisiana. When Sissy stopped in the roadway, intending to turn left into her private driveway, another vehicle driven by Gary Bailey collided with the rear of her vehicle. Both vehicles were "pulled over" to the right-hand side of Davis Road, remaining partially on the roadway.
Donald Handy, a nearby resident and a former police officer, approached the scene of the accident and attempted to aid the drivers. He checked for injuries and instructed the drivers not to move their vehicles. Handy also brought with him two flashing strobe lights and began directing traffic through the accident scene. Jaymie Edwards, also a nearby resident, offered to assist Handy in directing traffic. With Edwards positioned at the north end of the accident scene and Handy at the south end, the two began to allow alternating traffic to flow through the scene.
While directing traffic at the north end of the accident scene, Jaymie Edwards stopped a station wagon driven by Florence Baldwin. Shortly thereafter, an automobile driven by Edward M. Daugherty rear-ended Baldwin's vehicle. The force of the collision propelled Baldwin's vehicle into Edwards, who was standing with his back facing Baldwin's car. Edwards sustained severe physical injuries. Daugherty's blood alcohol level was 0.25 grams percent, significantly above the legal limit of 0.10 grams percent.
Like a tale from Ripley's "Believe It or Not," the ambulance summoned to attend Edwards was struck by a vehicle driven by David Blanchard while en route to the hospital. The trial court later found, however, "there was no evidence to suggest that this accident was serious or in any way aggravated Jamie's [sic] already serious injuries."
Suit was filed on behalf of Jaymie Edwards by his co-curatrixes and on behalf of his three children (for loss of consortium) by their natural tutrix. Made defendants were the following: (1) Edward M. Daugherty, the intoxicated driver, and his insurer; (2) the driver of the vehicle (Florence Baldwin) that was rear-ended by Daugherty and her insurer; (3) the driver (Gary Bailey) who rearended the left-turning motorist in the original accident and his insurer; (4) the parties *1117 involved in the ambulance accident and their insurers; (5) Sheriff Wayne McElveen of the Calcasieu Parish Sheriff's Department (whose deputies allegedly passed through the accident scene without rendering assistance); (6) the City of Westlake and one of its officers, Henry Simms (who allegedly passed the accident scene), and its insurer.
Numerous incidental demands were filed among the defendants, including a third-party demand against the City of Westlake and Donald Handy. Prior to trial, all parties were dismissed either via summary judgment or settlement except for Sheriff McElveen and his insurance company, Sphere Drake, and Edward M. Daugherty. The Sheriff's third-party demand against Donald Handy was dismissed after trial commenced, but prior to judgment.

ACTION OF THE TRIAL COURT
There were numerous pre-trial procedural disputes. Of particular significance were the requested recusal of the trial judge and the request by the Sheriff and Sphere Drake for a jury trial. The trial judge denied the motion for jury trial on the eve of the scheduled trial. Writs were filed by the Sheriff and Sphere Drake with this court. We denied both the Sheriff's and Sphere Drake's applications, noting no appropriate waiver of the right to non-jury trial was submitted by the Sheriff. Sphere Drake then sought supervisory review of our ruling and the Louisiana Supreme Court unanimously found it was entitled to a trial by jury. The Sheriff did not seek supervisory review; instead, the Sheriff filed a second motion for a jury trial and attached a resolution purportedly waiving his right to a non-jury trial in this case. The motion was argued and denied by the trial judge. Writs filed by the Sheriff with this court and the Supreme Court also were denied.
The Sheriff then moved to recuse the trial judge, specifically referencing certain public statements he allegedly uttered regarding the Sheriff's Office and criminal charges against his son. The motion was referred to Judge William McLeod, and after a hearing, it was granted. Plaintiffs then filed a writ application with this court on the recusal ruling. Ultimately, the writ was granted; and this court reversed the recusal judgment. The Sheriff applied to the Supreme Court for a supervisory writ on this issue. His application was denied.
When trial commenced, the issues as to all parties other than the Sheriff were tried by a jury and the issues relating to the Sheriff were tried by the judge alone. At the trial's conclusion, the jury returned a verdict finding Edward Daugherty (the intoxicated driver) 67.5% at fault and the Sheriff 32.5% at fault. No fault was assigned to Jaymie Edwards. The jury awarded Jaymie Edwards $185,000 in past due medical expenses, $1,250,000 in future medical expenses, $84,100 in past income loss, and $346,160 in future income loss. Each of the Edwards children were awarded $25,000 for loss of consortium. The jury did not award Jaymie Edwards any sum for past and future pain and suffering, mental anguish, or loss of enjoyment of life. The trial judge later entered a "judgment on the jury verdict" reflecting the jury's determinations.
For reasons assigned, the trial judge also entered a judgment resolving the issues involving the Sheriff. The trial judge assessed the Sheriff with 55% fault, and Daugherty with the remaining 45% fault in causing the accident. He awarded past medical expenses of $183,633, future medical expenses of $1,045,690, past income loss of $104,533 and future income loss of $894,312. He also awarded Jaymie Edwards $800,000 for past and future pain and suffering, mental anguish and loss of enjoyment of life. He awarded $150,000 for loss of consortium to Jennifer Edwards, and $100,000 for loss of consortium to both Janet Edwards and Jaymie Edwards, II.
Plaintiffs filed a motion for judgment notwithstanding the verdict (JNOV), in large part because of the jury's failure to make an award for pain and suffering and loss of enjoyment of life. In response to this motion, the trial judge granted the motion, "revising the jury verdict." The jury's apportionment of fault remained unchanged, but the trial judge altered the quantum awards for past medical expenses ($185,000 to $183,633), future income loss ($346,160 to $894,312) *1118 and loss of consortium ($25,000 for each of the three children to $100,000 for each child). The trial judge also awarded $800,000 for past and future pain and suffering and loss of enjoyment of life. After the grant of the JNOV the two judgments were as follows:

 JUDGE JURY
 I. Apportionment of Fault
 Sheriff McElveen 55% 32.5%
 Edward Daugherty 45% 67.5%
 Jaymie Edwards 0% 0.0%
II. Damages
 Jaymie Edwards
 a) Pain and Suffering; Loss of $ 800,000 $ 800,000
 Enjoyment of Life
 b) Medical Expenses
 (I) Past $ 183,633 $ 183,633
 (ii) Future $1,045,690 $1,250,000
 c) Income Loss
 (I) Past $ 104,533 $ 84,100
 (ii) Future $ 894,312 $ 894,312
 Jennifer Edwards $ 150,000 $ 100,000
 Janet Edwards $ 100,000 $ 100,000
 Jaymie Edwards, II $ 100,000 $ 100,000
 __________ __________
TOTAL DAMAGES $3,378,168 $3,512,045

The Sheriff suspensively appealed the judgments and now asserts the following assignments of error:
1. The trial court erred in failing to recuse Judge Carter, who maintained strong bias against Sheriff Wayne McElveen, the defendant/appellant herein and his deputies, from presiding in this case.
2. The trial court erred in denying Sheriff Wayne McElveen a trial by jury.
3. The trial court erred in its determination apportioning fault to Sheriff Wayne McElveen.
4. The trial court erred in not apportioning any fault to Donald Handy.
5. The trial court erred in not apportioning any fault to the City of Westlake.
6. The trial court erred in not apportioning any fault to Jaymie Edwards.
7. The trial court erred in apportioning only forty-five (45%) percent of liability to Edward M. Daugherty.
8. The trial court erred in awarding excessive damages to Jaymie Edwards, and his three minor daughters for loss of consortium.
Sphere Drake also filed an appeal and, while generally adopting the assignments of error advanced by its insured (the Sheriff), it specifically assigned the following additional errors:
1. The trial court erred in declining to include in the jury interrogatories an inquiry as to possible fault of certain non-parties as to whose involvement evidence was adduced at the trial, leading in turn to an improper allocation of fault.
2. The trial court and the jury erred in the conclusion that plaintiffs had established a cause-in-fact relationship between the alleged conduct of the sheriff's deputies and the risk that occurred.
3. The trial court and the jury erred in the conclusion that the ambit of protection spread by the duty imposed upon the sheriff's deputies properly included the risk that occurred.
4. The trial court erred in its determination and assessment of certain elements of damages awarded to plaintiffs.
Plaintiffs, in answering the Sheriff's appeal, seek an increase in the awards for future medical expenses, as well as for past and future pain and suffering, mental anguish and loss of enjoyment of life experienced by Jaymie Edwards. Responding to the appeal filed by Sphere Drake, plaintiffs seek modification of the judgments, insisting the trial court erred in failing to declare Sphere Drake's one million ($1,000,000) dollars policy limits is attachable to satisfy the awards reflected therein.

PROCEDURAL ASSIGNMENTS OF ERROR

I. Recusal of Trial Judge
The Sheriff argues Judge Carter should have been recused "because of his admitted belief that the defendant-appellant's deputies have unjustly investigated, arrested, and prosecuted his son on murder charges." This belief, the Sheriff maintains, "impaired his ability to conduct a fair and impartial proceeding."
By the time this case was actually tried it had been pending for nearly two years. On the first day of trial, after deciding several pretrial motions, Judge Carter recessed the case until the next day. For the first time, on that date, the Sheriff filed a recusal motion seeking to remove Judge Carter from the case based upon statements made by him *1119 in December, 1995 and February, 1996. Upon receipt of the Motion for Recusal, in accordance with La.Code Civ.P. art. 155, Judge Carter referred the motion to another judge for determination. Judge William McLeod heard the motion. Acknowledging no proof was presented that Judge Carter possessed any actual bias, he concluded nevertheless that a "substantial appearance of the possibility of bias" existed and recused Judge Carter. We granted plaintiffs' request for peremptory relief and reversed the judgment stating:
The grounds for recusal set out in La. C.C.P. art. 151 are the sole and exclusive grounds for recusal.... In the present case the trial court did not find that the trial judge was biased, only that there was "a substantial appearance of the possibility of bias." The trial court's ruling creates a new standard for recusal which has no basis in the jurisprudence. The possibility of a bias or conflict is an unmanageable standard. It is particularly inappropriate in the present case to allow recusation where the mover waits nine months from the alleged prejudicial statements to seek recusation. At the time the statements were made the law was clear that the sheriff's department was prohibited from having a jury trial. The Motion to Recuse filed the day before trial based on grounds which were known to the mover for nine months is no more than a means of last minute forum shopping. Since "an appearance of the possibility of bias" is not a grounds for recusal, the trial court erred in granting the defendant's Motion to Recuse. After a thorough review of the transcript, there is no evidence which would show bias or prejudice on the part of the trial judge.
Law of the case is a procedural principle which relates to the conclusive effects of appellate rulings at trial on remand. It is intended to prevent appellate courts from reconsidering prior rulings of law on subsequent appeal in the same case involving the same litigants. Sloane v. Davis, 619 So.2d 585 (La.App. 3 Cir.), writ denied, 629 So.2d 355 (La.1993); Trahan v. McManus, 96-669 (La.App. 3 Cir. 2/19/97), 689 So.2d 696. As we again noted in Guilbeaux v. Times of Acadiana, Inc., 96-360, p. 4 (La.App. 3 Cir. 3/26/97), 693 So.2d 1183, 1186, writ denied, 97-1840 (La.10/17/97), 701 So.2d 1327, "[c]ourts apply this principle to avoid indefinite relitigation of the same issue, to reach consistent results in the same litigation, and to afford a single opportunity for argument and decision of the matter at issue." See also, Barnett v. Jabusch, 94-819 (La.App. 3 Cir. 2/1/95), 649 So.2d 1158; Cardinal Fed. Sav. Bank v. Corporate Towers, 629 So.2d 462 (La.App. 3 Cir.1993), writ denied, 634 So.2d 396 (La.1994); Fuselier v. Amoco Prod. Co., 607 So.2d 1044 (La.App. 3 Cir.1992). But this principle, nonetheless, is purely discretionary in application. Sloane, 619 So.2d 585; Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971). This court has the power to review prior rulings on appeal in cases where palpable former error exists or where application would cause manifest injustice. Guilbeaux, 693 So.2d 1183; Sloane, 619 So.2d 585. Absent such showing, we have consistently applied the law of the case principle for reasons thus articulated.
The Sheriff passionately argues such circumstances exist in this case because "[his] case depend[ed] in large part upon the believability of his deputies. To hold that Judge Carter's admitted feelings of improper conduct of the Calcasieu Parish Sheriff's Office deputies did not reflect a bias or prejudice, such that a fair and impartial proceeding [could not be] had, would set a standard making it practically impossible for a judge to be recused unless he himself proclaimed that he would not be fair and voluntarily recused himself." The Sheriff urges Judge Carter's recusal was mandated by La.Code Civ.P. art. 151 B(5) which provides a judge of any court "may be recused when he is biased, or prejudiced against one of the parties to such an extent that he would be unable to conduct fair and impartial proceeding" and Canon 2 of the Code of Judicial Conduct which requires a judge to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and prohibits a judge "from allowing family relationships from influencing judicial conduct or judgment."
*1120 When we first visited this question, a panel of our members reviewed the record and concluded neither the evidence as a whole, nor the trial court's finding that a "substantial appearance of the possibility of bias" existed established statutory grounds for recusing Judge Carter. In particular, we noted Article 151, again cited by the Sheriff on second "go round," enumerates the exclusive grounds for recusal and it does not list a "substantial appearance of the possibility of bias" or even a "mere appearance of impropriety" as causes for removing a judge from presiding in a given action. See Pierce v. Charity Hosp. of Louisiana, 550 So.2d 211 (La.App. 4 Cir.), writ denied, 551 So.2d 1341 (La.1989). Even read broadly, the article still requires a finding of actual bias or prejudice. The bias or prejudice must be of a substantial nature and based on more than conclusory allegations. State v. Edwards, 420 So.2d 663 (La.1982); Tamporello v. State Farm Mut. Auto. Ins. Co., 95-458 (La.App. 5 Cir. 11/15/95), 665 So.2d 503; Pierce, 550 So.2d 211.
At the motion to recuse, the Sheriff elicited testimony from two key witnesses. The first, Mr. Vincent Lupo, a reporter for the Lake Charles American Press, testified in February, 1996 he interviewed Judge Carter regarding the arrest of his son and at that time the judge commented: "My son is suffering because of my status." Admittedly paraphrasing, the reporter also related: "The judge said he accused law enforcement authorities and prosecutors of bringing charges against his son because of `who I am.'" The second witness, Donald Delouche, was a Calcasieu Parish Sheriff's Officer assigned to the Violent Crimes Task Force. He, along with Ramby Cormier, a Lake Charles City Police Officer also assigned to the same Task Force, investigated the case involving the judge's minor son who was arrested on December 20, 1995. On this date, the minor was questioned by Ramby Cormier, then working as "lead officer in the investigation." Judge Carter and Officer Delouche were present during the interview. In response to the minor's repeated denials that he was present at the scene of the crime, Officer Cormier revealed "he had witnesses that had placed him at the scene and that [there were] statements from those witnesses." At some point after this exchange, Delouche related the officers "took a break and walked outside and went into the secretary's office," accompanied by Judge Carter who "turned to Officer Cormier and said, `I know that y'all routinely lieI know that the police routinely lie to suspects in order to get them to confess; I don't think you need to be doing that with my son." But, Officer Delouche candidly admitted in response to a series of questions posed to him by opposing counsel:
Q. Mr. Delouche, I'm not a criminal lawyer; I have no experience in it. All I know is what I see on TV.
A. Yes, sir.
Q. And I know on TV that when you get a suspect in a room, sometimes you might act like you have more than you really have, to try to get the suspect wondering how much you have so that they might be a little more forthcoming. Is thatis that fair? Are there times when law enforcement will attempt to get some honest information from a suspect?
A. Yes, sir, thatthat technique is impliednot impliedthat is employed in some cases. That was not being done in this case.
Q. I understand. I'm just asking in general.
A. I understand. I understand.
Q. In general, obviously, the suspect doesn't know how much you know, and there are times when you will act like you know more than you know so that he'll admit to things, correct?

A. That's correct, sir..
We have surfed through 26 volumes of record and are unable to locate either the tape or a transcription of Judge Carter's statement at the hearing on the Motion to Recuse. As such, we are left to surmise from the accounts of counselors during the hearing that the trial judge admitted he had a particular problem with Officer Cormier, employed by the Lake Charles City Police Department; but he held "no animosity towards law enforcement as a class of people," *1121 noting "he has sat in on criminal matters and other cases ... where law enforcement testifies, and does not have any bias against their veracity."
The main thrust of the Sheriff's discontent, as expressed at the hearing, hinged on his assumption that the judge would not afford "a presumption of credibility" to his deputies if called as witnesses at trial. Neither Officer DeLouche nor Officer Cormier were expected trial witnesses in this case; and all the parties' readily conceded they knew nothing about it. The Sheriff has not cited a single instance where he voiced similar concerns regarding the judge's ability to assess the credibility of his deputies out of the many cases he had occasion to hear prior to and even since the present. Yet, the Sheriff suggests that somehow this case is special and we should, like he, assume the judge could not and did not afford him an impartial trial. In particular, he points to several pretrial and trial rulings by Judge Carter and alleges they serve as additional evidence that he was biased or prejudiced. Each of the cited rulings have been carefully examined by us, and as will become evident from our discussion below, none of them validate the Sheriff's allegations. We note, as well, the judge's comments were uttered nearly nine months before the Sheriff filed this recusal motion. He waited until the first day of trial to file the motion; and, even then he opted not to immediately advance itagreeing, instead, to allow the judge to rule on his pending motion for jury trial.
Bias and impartiality are never assumed for obvious reasons: Assumptions are not facts and appearances are seldom as they seem. Thus, the legislature has not seen fit to include the latter as Article 151 causes for the recusal of a judge. Unaided by assumption, the record simply does not show Judge Carter was biased or prejudiced against the Sheriff or any deputy he expected and did call to testify in this particular case.
The Sheriff also argues Judge Carter's recusal was required by the Code of Judicial Conduct. Though cognizant of the Supreme Court's recent disciplinary rulings interpreting the ambit of the Code of Judicial Conduct, we know the courts of this State have repeatedly held the statutory grounds for recusal mentioned in Article 151 are exclusive and not illustrative. Owens v. Jackson, 550 So.2d 359 (La.App. 3 Cir.1989); McCartney v. Columbia Heights Nursing Home, Inc., 25,710 (La.App. 2 Cir. 3/30/94), 634 So.2d 927; Pierce, 550 So.2d 211; Bergeron v. Illinois Cent. Gulf R.R. Co., 402 So.2d 184 (La.App. 1 Cir.), writ denied 404 So.2d 1260 (La.1981). Although Canon 3(C) was amended in 1996 to provide that "a judge should disqualify himself or herself in a proceeding in which the judge's impartially might reasonably be questioned," the statutory grounds for recusal in civil cases have not been amended by the Legislature. None of the disciplinary cases cited by the Sheriff discussed the authority of an intermediate appellate court to discount or nullify a judge's decision in a case because of alleged violations of the Code of Judicial Conduct which do not fall within the statutory mandates found in Article 151. Judicial discipline is a matter within the exclusive authority of the Louisiana Supreme Court, and we are unable to find any law declaring otherwise.
Finding no palpable error or manifest injustice, we must apply the law of the case principle and put this issue to rest.

II. Right To Jury Trial
The Sheriff's demand for trial by jury was twice denied below. From each denial, the Sheriff sought supervisory review by this court. Although the trial judge ruled that the Sheriff's demand was untimely and proceeded to strike the jury, we found on first review "no error in [his] granting of the motion," noting "La.R.S. 13:5105 prohibits a political subdivision from being tried by jury unless the political subdivision, by general ordinance or resolution, makes a blanket waiver against a jury trial in all suits, not merely a specific proceeding." As mentioned, the Sheriff initially failed to submit any waiver of his right to a non-jury trial. The Sheriff did not seek supervisory review of this ruling by the Louisiana Supreme Court. Instead, the Sheriff sought to cure the noted defect by filing a belated waiver of his right to a non-jury trial. The trial court, *1122 again, rejected the Sheriff's demand; this time finding the resolution was insufficient. Agreeing, this court held "there [was] no error in the trial court's denial of relator's second motion for jury trial as the resolution of the sheriff [was] not a blanket waiver of the prohibition against jury trials as required by La.R.S. 13:5105." The Sheriff sought writs with the Louisiana Supreme Court which denied his request.
The Sheriff, again, stands before this court complaining that his right to trial by jury was violated. In a nutshell, the Sheriff argues that La.R.S. 13:5105(D) does not require a "`blanket waiver' in order for a political subdivision to avail itself of its provisions," and even if it does the waiver submitted in this case "should be read in such a manner so as to constitute a `blanket waiver.'" To do otherwise, the Sheriff urges, "is inconsistent with the jurisprudence requiring indulgence in every presumption against waiver, loss or forfeiture of a litigant's fundamental right to a jury trial."
The Sheriff's argument, however, is flawed. Recently, the Louisiana Supreme Court reiterated that "the right to a jury trial in a civil case is not fundamental, i.e., is not made mandatory on the states under the Fourteenth Amendment and is not constitutionally enshrined in the 1974 Louisiana Constitution. The legislature can pass any law affecting a party's ability to obtain a jury trial provided it does not violate any constitutional provision." Kimball v. Allstate Ins. Co., 97-2885 (La. 4/14/98), 712 So.2d 46. See also, Blanchard v. City Parish of East Baton Rouge, 95-2011 (La.App. 1 Cir. 4/30/96), 674 So.2d 317, writ denied, 96-1511 (La. 9/20/96), 679 So.2d 443. Of course, once the state bestows to a party the right to trial by jury and that party complies with the statutory prerequisites to preserve the right, then any attempt to revoke it may offend "due process" principles. Revel v. Telecheck Louisiana, 581 So.2d 405 (La.App. 4 Cir.), writ denied, 588 So.2d 1116 (La.1991).
Subsection (D) of La.R.S. 13:5105 reads:
Notwithstanding the provisions of Subsection A, a political subdivision, by general ordinance or resolution, may waive the prohibition against a jury trial provided in Subsection A of this Section. Whenever the jury trial prohibition is waived by a political subdivision and a jury trial is demanded by the political subdivision or the plaintiff in a suit against the political subdivision or against an officer or employee of the political subdivision, the demand for a jury trial shall be timely filed in accordance with law ... (Emphasis added).
La.Code Civ.P. art. 1733 provides: "The pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury."
First, plaintiffs argue that the Sheriff's jury trial request came too late. They urge "the ten day period set forth in Article 1733(C) commenced when [International Surplus Lines Insurance Company,] the only party requesting trial by jury was dismissed from this case on October 31, 1996." Citing Navarro v. South Central Bell Telephone Co., 470 So.2d 983 (La.App. 1 Cir.1985) and City Stores Co. v. Johns-Manville Sales Corp., 395 So.2d 953 (La.App. 4 Cir.1981), they maintain the dismissal was "the equivalent of withdrawing its request, and the other non-requesting parties had 10 days from notice of the dismissal to file a jury trial request." The Sheriff's motion was not filed until the day before trial fixing, 17 days after the dismissal and well beyond November 12, 1996, which plaintiffs insist was the final date he had opportunity to preserve the right. Responding, the Sheriff argues his motion was timely because the 10 day period did not commence until the trial court granted plaintiffs' motion to strike the jury, which delay elapsed after filing of his second motion for jury trial.
Echoing our earlier rulings on this issue, plaintiffs also assert the Sheriff's resolution, waiving the right against jury trial "in the above captioned matter," was not a blanket waiver and, thus, insufficient to comply with La.R.S. 13:5105. But the Sheriff insists that "no provision in La.R.S. 13:5105(D) [requires] *1123 a `blanket waiver' for a political subdivision to avail itself of the right to jury trial; even, if such is required, the resolution's recital "in the above captioned matter" should not be read as "in the instant case." Instead, it should be read as "in the above captioned matter and all other matters."
We turn first to examine our earlier ruling for error. Although the Sheriff encourages us to accept his interpretation of R.S. 13:5105(D) as opposed to that of two separate panels of our members, he cites no jurisprudence or other authority, even by analogy, as support for the meaning he ascribes it. His argument apparently is premised on the absence of the word "blanket" as a communicative term in the provision; ipso, he concludes submission of a waiver on a "case by case" basis is permissible to comply with the provision's mandate. But reading Subsection D as the Sheriff suggests renders an essential portion of it meaningless. The provision clearly states when a political subdivision waives the right to a non-jury trial either the political entity or the plaintiff may request trial by jury. If the right was waivable on a case by case basis, plaintiffs right to a jury trial would depend entirely on the Sheriff's capriciousness. Plaintiff could never request a jury trial if the sheriff did not will it; but, the sheriff could demand trial by judge or jury in any case.
While the right to trial by jury is not a fundamental right, this State cannot grant the right to a particular litigant in civil actions and deny it to others in the same action or similar actions. The legislature is prohibited from passing any local or special law which deals with any of the subjects enumerated in La. Const. Art. III, § 12(A). Kimball, 712 So.2d at 46. The Supreme Court stated in Kimball, 712 So.2d at 52, "[a] special law is one that confers particular privileges, or imposes peculiar disabilities or burdensome conditions in the exercise of a common right upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relations to the subject law." See also, JOHNSON, LEGISLATIVE PROCESS, 36 La.L.Rev. at 549 (1976); State v. Labauve, 359 So.2d 181 (La.1978); Teachers' Retirement Sys. of Louisiana v. Vial, 317 So.2d 179, 183 (La.1975). To interpret La.R.S. 13:5105 as suggested by the Sheriff necessarily would require us to declare it a special law. The law would allow a political subdivision, an extension of the state, to select which civil action it desired to try by jury out of all civil cases filed against it by plaintiffs alleging similar or same causes, without any justification or reason. As such, it would violate Art. III, § 12(A)(3)[1] of the Louisiana Constitution "which prohibits the legislature from passing a special law which affects any particular lawsuit." Kimball, 712 So.2d at 53. See also, Everett v. Goldman, 359 So.2d 1256 (La.1978); State v. McCue, 141 La. 417, 75 So. 100 (1917); State v. Felter, 141 La. 58, 74 So. 629 (1917). We do not believe the legislature, when enacting La.R.S. 13:5105, intended to violate this constitutional restriction or that the statute nonetheless grants a political subdivision the power to arbitrarily decide whether or not it will have a jury trial in a particular civil action.
Courts are required to interpret a statute "so as to preserve its constitutionality" if there is a reasonable way to do so. State in the Interest of A.C., 93-1125 (La.1/27/94), 643 So.2d 719; State v. Newton, 328 So.2d 110 (La.1975). In interpreting a statute, we must "consider all parts together, giving effect to all parts, if possible, and not construing as surplusage any sentence, clause or word, if a construction can be legitimately found which will give meaning to and preserve all the words of the statute." Perkins v. State Bd. of Elementary and Secondary Educ., 562 So.2d 930, 930 (La.App. 1 Cir.), writ denied, 565 So.2d 448 (La.1990). The legislature is never presumed to have inserted "superfluous, useless and meaningless words, sentences, phrases, or clauses in its enactments." Colwell v. State, Through *1124 Office of Atty. Gen. of Louisiana, 506 So.2d 941, 944 (La.App. 1 Cir.), writ denied, 508 So.2d 89 (La.1987).
Reading La.R.S. 13:5101 as a whole, with particular focus on Subsection (D) and all of its words, we find no rational justification for deleting from it the words "or the plaintiffs in a suit;" and, equally so, no good reason for adding, as the Sheriff urges, the phrase "in the above captioned matter." Neither are we persuaded to read "in the above captioned matter" as "in the above captioned matter and all other matters." A political subdivision must be presumed to know the generally prevailing meaning of the words it uses in an enactment or resolution. The Sheriff does not allege that words "and all other matters" were not included in the resolution because of some typographical or other clerical error.
To give effect to the whole provision, mindful that we must presume the constitutionality of a statute, it just makes better sense to interpret La.R.S. 13:5105 as requiring a political subdivision to execute a blanket waiver, foregoing its right to non-jury trial in all civil actions when it desires a jury in any particular one. Reading the statute in this manner avoids infringement on plaintiffs' due process rights and renders it in compliance with Art. III, § 12(A)(3). Accordingly, we find no palpable error in our earlier rulings on this issue. Finding none, it is unnecessary to address the companion timeliness issue, though we note in passing that our brethren on the first circuit court of appeal in Navarro, 470 So.2d 983, found untimely a motion for jury trial where the lone defendant who had perfected such a request had been dismissed and the remaining defendants waited more than ten days after this party's dismissal to file their request.

JUDGMENT ASSIGNMENTS OF ERROR

I. Standard of Review
Courts of appeal normally review findings of fact using the manifest error or clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). The Sheriff and Sphere Drake argue the judge and jury determinations are in substantial conflict; thus, we must apply the de novo rather than manifest error standard in reviewing this record on appeal. They cite Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3 Cir. 2/15/95), 651 So.2d 865, writs denied, 95-667 (La.4/28/95), 653 So.2d 592 and 95-676 (La.4/28/95), 653 So.2d 593, a decision rendered by this court, which they assert supports their position.[2] However, they failed to mention our holding in Ourso v. Grimm, 92-1274 (La.App. 3 Cir. 1/5/94), 630 So.2d 963, writs denied, 94-339 (La.3/25/94), 635 So.2d 231 and 94-346 (La.3/25/94), 635 So.2d 230. In that case, we said "in a bifurcated trial where the jury and the trial judge reach conflicting findings as to the liability of public and private defendants, a JNOV is a proper means of reconciling the two verdicts." Id., at pp. 3-4, 630 So.2d at 966; See also, Dean v. Terrebonne Parish Police Jury, 510 So.2d 82 (La.App. 1 Cir.1987), citing Champagne v. American Southern Ins. Co., 295 So.2d 437 (La.1974); Randolph v. General Motors Corp., 93-1983 (La.App. 1 Cir. 11/10/94), 646 So.2d 1019, writ denied, 95-194 (La.3/17/95), 651 So.2d 276; Lemire v. New Orleans Pub. Serv., Inc., 458 So.2d 1308 (La.1984). We noted "[i]n such cases, this circuit has adopted the position that there is no conflict between the findings of the jury and the trial judge because, as a matter of law, the jury has no right or duty to adjudicate the fault of the public defendant." Ourso, 630 So.2d at 965-66. See, Lasswell v. Matlack, Inc., 527 So.2d 1199 (La.App. 3 Cir.), writ denied, 532 So.2d 104 (La.1988); Rogers v. Calcasieu Parish Police Jury, 487 So.2d 190 (La.App. 3 Cir.), writ denied, 489 So.2d 924 (La.1986).[3] *1125 The trial judge granted a JNOV in this case, adjusting the jury's quantum award; but he did not change the jury's fault assessment. The trial judge found the Sheriff 55% at fault for causing Jaymie's injuries; and, the jury assessed him only 32.5% fault in causing these injuries. In reviewing the JNOV's quantum adjustments, we will apply the manifest error/abuse of discretion standard. Dowden v. Mid State Sand & Gravel Co., Inc., 95-231 (La.App. 3 Cir. 11/2/95), 664 So.2d 643, writ denied, 95-2864 (La.2/2/96), 666 So.2d 1099; Higley v. Kramer, 581 So.2d 273 (La.App. 1 Cir.), writ denied, 583 So.2d 483 (La.1991). However, we find the assessment of fault by the judge and jury remain in conflict and must be harmonized.[4] Accordingly, we will examine the record to decide which fault assessment is more reasonable. Hasha, 651 So.2d 865.

LIABILITY
We must employ the duty/risk analysis in reviewing the lower court liability judgment against the Sheriff and his insurer for the tortious acts which plaintiffs complain caused them injury. Blair v. Tynes, 621 So.2d 591 (La.1993); Vicknair v. Hibernia Bldg. Corp., 479 So.2d 904 (La.1985); Harris v. Pizza Hut of Louisiana, 455 So.2d 1364 (La.1984). As the Supreme Court instructed in Blair, 621 So.2d 591, the determination of legal liability in tort cases necessarily turns on several pertinent inquiries which include: 1) whether the conduct of which plaintiff complains was a cause-in-fact of the harm; 2) whether there was a duty on the part of the defendant which was imposed to protect against the risk involved; 3) whether there was a breach of that duty; and 4) damages.
The Sheriff first asserts that the trial judge and jury manifestly erred in finding the conduct of his deputies was a factor in causing the second accident. The facts, he claims, simply do not establish that his deputies passed the scene of the first accident, without stopping, prior to the second accident occurring. He also complains the trial judge compounded this alleged factual error by applying, in plaintiffs' favor, an evidentiary presumption that he failed to produce certain radio tapes and statements because they would have been detrimental to the defense. Even if the facts were sufficient to establish that his deputies passed the scene of the first accident, the Sheriff remains convinced, their failure to do so was not a cause-in-fact of the second accident; and, "the scope of protection afforded by the duty of [his deputies] did not extend to the harm sustained by [Jaymie Edwards] when a speeding, grossly intoxicated driver crashed into the well-lighted scene where [Jaymie] had voluntarily placed himself in a position of peril."
Sphere Drake argues, furthermore, whether the phraseology used in determining the ambit of the duty owed by the Sheriff is "`proximate' versus `remote' causation, or risks beyond the ambit of protection spread by the defendant's duty, or `legal' causation, or some other phrase," a defendant who has engaged in substandard conduct "cannot reasonably be asked to respond to all persons for all risks which can causally be linked to their conduct." Sphere Drake's argument rests on the following oft-quoted Wex S. Malone comment:

*1126 All rules of conduct, irrespective of whether they are the product of a legislature or are part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that my befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of determining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape. (Emphasis added).
MALONE, RUMINATIONS ON CAUSE AND FACT, 9 Stan.L.Rev. 60, 73 (1956) (emphasis added).
In final analysis, Sphere Drake asserts, we must decide whether the risk incurred by Jaymie Edwards, even if linked to the alleged omitted conduct of the Sheriff's deputies, ought to be one with compensable consequences. In making this determination, it encourages us to entertain the following policy considerations:
(1) ease of association: how easy is it to associate the type of harm suffered by the plaintiff with the conduct of the defendant?...
(2) administrative considerations: Will the inclusion of risks such as this one pose problems in future cases?....
(3) economic consideration: are there indications that this loss can be borne equally as well by plaintiff as by defendant, or that placing such an economic burden on defendant in this and future cases will jeopardize or perhaps terminate his activity, which is vital to society, or at least might make it unduly expensive?
(4) moral consideration: is the plaintiff a person entitled to broad protection by the law (such as a rescuer or a child), or conversely has the plaintiff failed to take precautions to avoid the risk presented or failed to mitigate his own damages, so that his position in the courtroom is not necessarily deserving of any special treatment or any broad inclusion of the risk that he actually incurred?
(5) type of activity which defendant engages: is the defendant engaged in a particularly dangerous activity for profit which ought to bear some or most of the accident costs as the expense of doing business, or it defendant engaged in a socially necessary activity which might ill afford the imposition of an unusual risk though the risk might be causally related to the activity?
We are not without guidance in assessing the merit of defendants' contentions. The legislature vested law enforcement officers with exclusive authority to regulate traffic; and they are "duty bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm." Blair, 621 So.2d at 596; LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978). When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that the public is not subjected to unreasonable risks of harm. Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173; Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672 (La.App. 3 Cir.1991). The duty to control traffic encompasses "not only the direction of vehicular traffic, but also the direction of pedestrian activity." Blair, 621 So.2d at 596.[5] In Curry v. Iberville Parish Sheriff's Office, 405 So.2d 1387 (La.App. 1 Cir.1981), writs denied, 410 So.2d 1130, 1135 (La.1982), the first circuit affirmed a lower court judgment holding an auxiliary deputy liable for injuries sustained by a pedestrian. Though the facts in that case are not on all fours with the present, they are strikingly similar. Mr. Curry was a passenger in a vehicle which was struck by an Iberville Parish Sheriff's Office vehicle, operated by auxiliary deputy Daigle. After walking *1127 to the rear of his vehicle to inspect the damage, Mr. Curry was injured when a vehicle driven by a highly intoxicated motorist struck his vehicle which was partially obstructing the highway. Deputy Daigle admitted "he had taken no steps to protect the scene of the [first] accident before the second accident occurred." Id. at 1389. Upholding the jury's liability finding, the appellate court noted:
"[T]he evidence is clear that a deputy is charged with the responsibility of protecting an accident scene. There is ample evidence that [the deputy] had two to three minutes in which to perform that duty, which was more than enough time. We agree with the jury that his failure to do so was a cause in fact of the second accident."
Id. (emphasis added).
The defendants also argued "Curry's conduct in knowingly placing himself in a position of peril, on a public highway, constituted contributory negligence which preclude[d] his recovery." Rejecting this argument as well, the court found Curry's position "proved to be perilous because of the failure of [Daigle] to protect the scene of the accident and the failure of [the drunk driver] to see what he should have seen." Id, at 1389.
Again, in Duvernay v. State, Through Department of Public Safety, 433 So.2d 254 (La.App. 1 Cir.), writ denied, 440 So.2d 150 (La.1983), the first circuit affirmed a lower court judgment holding a deputy sheriff liable for injuries sustained in an accident which occurred at the scene of a malfunctioning light. In that case, a traffic light at the intersection of two highways was malfunctioning. The condition was reported to the deputy who was a dispatcher for the Ascension Parish sheriff. The deputy reported the condition to the State Police. No steps were taken by the deputy to have the intersection secured. An accident occurred at the scene of the malfunctioning light causing injuries. The court stated:
As did the trial court, we find that once [the deputy] became aware of the dangerous traffic situation that existed, he then had the duty to take affirmative action to see that motorists, such as Duvernay, were not subjected to unreasonable risks of harm. He did not fulfill his duty merely by sending the teletype message to the State Police. He was required to do more. He should have ascertained if the message was received. He should have either dispatched a patrolman to the scene immediately or made sure the State Police sent a trooper to secure the intersection. He should have made his replacement fully aware of the circumstances. We agree with the trial judge that the intersection could and should have been secured by the Sheriff's Department prior to the accident. [The deputy] breached the duty placed upon him.
Mindful of the holding in these cases and the statutory duty imposed on law enforcement officers generally, we turn to address the specific issues raised by the Sheriff and Sphere Drake.

I. Did a Deputy Pass the Accident Scene?
The Sheriff argues the trial judge and jury clearly erred when they concluded his deputies passed through the scene of the first accident and failed to stop. Five witnesses (Donald Handy, Rooney Woodard, Cecil Roessler, Marvin Norwood and Carolyn Norwood) testified two Calcasieu Parish Sheriff's deputies drove through the initial accident scene without stopping.
Standing in their yard between 6:00-6:30 p.m. on December 22, 1993, Donald Handy and his wife noticed Sissy Woodard and waived to her as she proceeded in the direction of her driveway. Seconds later, they observed the hood of a pick-up truck "dipping" as the driver tried to stop it. While they attempted to waive Sissy "off," they "heard [tires] squealing and moments later [the pickup truck] reared [Sissy's vehicle]"pushing it some distance in the front yard of Jaymie Edwards. Seeing two individuals exit the truck, Donald Handy decided to aid his neighbor, who was still in her vehicle complaining of neck pain. After urging her to keep still while awaiting the arrival of an ambulance, he ran across the street to alert Sissy's family. When he returned, accompanied by Sissy's husband, he noticed a "lot of children ... playing around the truck" *1128 which was halfway on the road, partially obstructing it. According to Handy, there also were "people on foot ... people were slowing down [in their cars] ... and [he] could almost envision another rear end accident." So, he "tried to control the situation" by directing traffic through the accident site. Within minutes, Jaymie Edwards, also witnessing the first accident, offered to help Handy. Edwards positioned himself north while Handy remained south of the accident scene. As daylight rapidly faded, the wives of the two men handed them each a "red tipped" flashlight and a two-way portable radio. The men continued to direct traffic using the radios to communicate between them, the flashlights as they signaled motorists, and two strobe lights which they placed in the roadway "at certain times." The strobes, Handy described, were "little bitty things" with actual aluminous tips "smaller than the foam padding on [a] microphone;" and not at all "in the same league as....[found] on the top of a police vehicle." About 5-10 minutes later, Handy testified, he noticed a law enforcement unit, with flasher on, approaching from the north with Calcasieu Parish Sheriff Wayne McElveen's name and the Parish's decal on the side. Passing "within 30 feet of [him]," Handy stated, the unit "[headed] south" through the accident scene with its red strobe lights activated, and continued without stopping before "[hanging] a right" a quarter of a mile down the road. Five to ten minutes later, Handy related, a second law enforcement unit (with the Westlake Police Department decal showing) slowed down as it too proceeded through the accident scene headed south. Noticing the driver waiving at him, Handy (who worked part-time in the past for the Westlake Police Department) identified the driver as Officer Henry Simms. About 10 minutes later, a third unit "[came] from the north" headed south; but, as Handy testified, this unit "actually stopped." Again, Handy noticed the marking on the unit, and stated it was a Calcasieu Parish Sheriff's car. The driver "rolled his window down," according to Handy, while making a "friendly gesture toward him." Thinking at first that the deputy knew him, Handy inquired: "how are you doing, sir?" As Handy related, the driver responded with the same question, "[shaking his] hands very [professionally];" he was neatly dressed in a uniform which had a "Calcasieu Parish map on the left sleeve" and a "star badge" on the front. When the driver asked "how to get to Moss Bluff," Handy testified, he answered the deputy's question, watched him turn his unit around, and proceed in that direction. Five to seven minutes later, Handy stated, Jaymie by radio "warned [him] about a vehicle ... coming toward [him] from the south [pretty quick];" he turned looked south, heard an impact sound, an engine racing, and noticed a car turned sideways before becoming airborne, striking a nearby pine tree. He proceeded toward the vehicle that hit the tree; and, as he attempted to open the door, the driver shoved and it opened. The driver appeared "aggravated," resisted assistance, was cursing, rocked from right to left; and, Handy smelled alcohol not only "on his breath, but on his person." Handy also attempted to assist the driver's wife who was crouched "under the glove compartment ... down beneath the dash regurgitating." While professing she was not hurt, the passenger blurted out "I'm not sick, I'm just drunk we just came from a party." Handy then noticed a body in the fetal position near the second accident scene attended by Mr. Rooney Woodard. As Handy attempted to assist other people he thought might be injured, an ambulance arrived and "picked up Jaymie." The roadway near the two accident scenes became impassable. A state trooper arrived shortly thereafter; but Handy remained at the site, offering his assistance, until "almost 10:00 p.m" when he proceeded to the hospital where Jaymie was transported. During the course of his stay, Handy testified, people were standing just inside the foyer ... and "there was yelling going on everybody was very upset because weeveryone there just felt like this could not have happened." Shortly after arriving, two supervisors from the Calcasieu Sheriff's Department "came up and talked" to the group and stated "they wanted statements and asked if [they] mind being tape recorded." According to Handy, the supervisor began questioning them "one-on-one;" and he remembered relating that two Calcasieu Parish Sheriff's units had *1129 passed the scene without stopping. As they prepared to leave, the supervisors asked Handy "did you speak to anyone else about this accident," when he said "no, sir," they said "good we'll keep it that way ... we'll be in touch." Handy never heard from the supervisors again. On cross-examination, Handy recalled the events a second time; his testimony was essentially the same as on direct examination. Handy acknowledged that the "times" he recalled throughout the ordeal might not be accurate; but he felt comfortable in attesting that the second accident occurred 15-20 minutes after the first.
Mr. Rooney Woodard, Sissy's father-in-law, also testified two Calcasieu Parish Sheriff's units passed through the accident scene without stopping. Mr. Woodard remained at the scene after Sissy was transported to the hospital. He stated two Calcasieu Parish Sheriff's units and one Westlake Police unit passed through the accident scene.[6] He overheard the driver of the second Calcasieu Parish Sheriff's unit ask Handy for directions to Moss Bluff. Although the sequence in which Woodard recalled each law enforcement unit passed by the scene of the first accident varied somewhat from Handy's account, he never wavered in his testimony that two Calcasieu Parish Sheriff's units passed the accident scene.
Marvin Norwood and his wife, Carolyn, were entering their car "fixing to go Christmas shopping, when they heard sounds from the first accident between "5:00 and 6:00 p.m. that evening." After discovering their niece, Sissy Woodard, was involved in the accident, the Norwoods testified they remained in their car parked in the driveway "watching the scene" of the accident for an "hour, hour and a half." As they explained, Sissy's car "coasted up pretty close to [their] home." During this time, they saw two sheriff's and one city police unit pass the scene of the accident. As Mr. Norwood related, "[t]he City Police car stopped briefly, talked to [the man that was flagging traffic] and he left and then the Sheriff's Department car, one of them, I'm not positive, I think he turned around on Olin Street." Mrs. Norwood admitted she was not attentive all the time; but, she saw a white car first and then a blue car. The white car she identified as a sheriff's car, although she referred to them all as "cop cars." The Norwoods could not remember whether the law enforcement units arrived before or after the ambulance that transported Sissy to the hospital left. They were certain, however, that between the arrival of the ambulance and their leaving the scene, the units passed the scene. Both Norwoods testified they left the scene sometime after the ambulance left, "maybe 10-15 later," but they could not say definitely how much time actually elapsed.
Cecil Roeseler's testimony, the nephew of Rooney Woodard, was the most inconsistent of all the eyewitnesses. Arriving at the scene before the second accident, he initially recalled on direct examination seeing two Calcasieu Parish Sheriff's units and one Westlake unit pass without stopping. On cross-examination, Cecil's recollection faded. He stated the first accident occurred around 4:00-4:30 in the afternoon, but he could not really say for sure; the ambulance did not arrive for a long time but he could not "pin" the time down; the second accident happened an hour-hour and half after the first but he could not remember the "times because it [had] been a long time ago;" a Calcasieu Parish Sheriff's unit passed the scene before the ambulance arrived but he admitted testifying at an earlier deposition that he saw Officer Simms in a Westlake Police Unit pass the scene twice before the second accident. He also stated the Norwoods followed the ambulance as it left the scene with Sissy en route to the hospital.
At trial, the defense attempted to establish at no time did a Calcasieu Parish Sheriff's Deputy transverse the accident scene because all deputies were accounted for and were questioned regarding the accident. The Sheriff introduced various time logs maintained by his Office, time records kept by the ambulance service and the state police to show that a very short period elapsed *1130 between the time the first ambulance departed the scene and the time Jaymie Edwards was injured. The Sheriff argued this short period of time (which he contends was approximately 8 minutes) was not enough time for a Sheriff's deputy to take control of the accident scene. In brief, the Sheriff recites "the log of the ambulance indicated it left at 6:34 p.m ....[t]he 911 call concerning plaintiffs accident came in at 6:42 p.m., only eight (8) minutes later." However, the Calcasieu Parish Communications District log, which the Sheriff references to support his time-line theory, shows the contrary. When the dispatcher first notified the Life Care unit that an accident had occurred on Davis road, the operator of the unit responded "they [had] been there since [6:25 p.m.]." Handy testified the first vehicle to arrive at the scene was a white sedan with a Life Care emblem (Holston) on its side. This vehicle, he estimated, arrived "5-10 minutes" after the first accident. Tom Javins, an employee of Life Care Emergency Medical Services, testified he actually arrived at the scene at 6:23-24 and called for an ambulance at 6:25. The trial judge found the first ambulance departed at 6:34 p.m. and "the call to the ambulance service for the second accident was around [6:48]," which "would suggest a 14-minute difference in time gap." Although defendants question the trial judge's estimation, and the witnesses' recollection of when the law enforcement units traversed the scene of the accident, the record shows the first accident occurred prior to 6:25 and the second accident occurred a minute or two before 6:42. We believe a rational trier of facts could reasonably conclude that at least 14 minutes elapsed between the two accidents; and, the witnesses were truthful but, as they admitted, were unable to accurately recall the sequence or exact times the units passed the scene after the first accident.
Even the Sheriff urges us in brief to accept as truthful Donald Handy's and Rooney Woodard's recollection that Henry Simms, the City of Westlake officer, passed through the accident scene without stopping to direct traffic. While readily accepting these witnesses testimony to prove the presence of Officer Simms at the accident scene, he asks this court to disregard the same witnesses' testimony regarding the conduct of his deputies. Although defendants refer us to the testimony of Gary Bailey, Tom Javins, Hugh Sanders, Ruth Handy, and Virginia Gail Edwards, all the cited witnesses on cross examination admitted either not arriving at the scene immediately after the first accident, not noticing Handy or Edwards directing traffic, not focusing on all the events occurring at the time, or leaving the scene from time to time to attend other matters. A reasonable judge or jury could have found these witnesses' testimony did not sufficiently rebut the accounts related by the eyewitnesses who confirmed seeing the law enforcement units pass the scene of the accident.
In reviewing the evidence, we are guided by the manifest error-clearly wrong standard, which authorizes us to reverse a trial court's factual finding only if we find from the record that a reasonable factual basis does not exist for the finding of the trial court and the record establishes the finding is clearly wrong. Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880 (La.1993); Mart v. Hill, 505 So.2d 1120 (La. 1987). An appellate court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. A reviewing court must examine the record in its entirety to determine whether the trial court's finding were clearly wrong or manifestly erroneous. Id. The real issue is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart, 617 So.2d 880.
We cannot say, after carefully reviewing the evidence, that the trial judge or jury manifestly erred in accepting as true the witnesses' testimony that two sheriff's unit *1131 and one city police unit traversed the scene of the first accident without stopping.
Neither are we convinced the trial judge committed legal error by applying, in plaintiffs' favor, an evidentiary presumption that the Sheriff failed to produce certain radio tapes and statements because they would have been detrimental to the defense. After receiving a complaint that two deputies had driven past the scene of the first accident and failed to render assistance, Deputy Bill McIntosh was instructed to investigate the allegations. He obtained statements from several witnesses gathered at St. Patrick's Hospital, where Jaymie Edwards was transported following the accident. Deputy McIntosh prepared a report detailing the allegations and his investigation. He handed the report to his supervisor with the witnesses' statements attached to it. The report and all the statements subsequently vanished; and the radio tapes recording the conversation of Calcasieu Parish Sheriff's deputies during the relevant period also were erased.
The failure of a litigant to produce evidence within his reach raises the presumption that the evidence would have been detrimental to his case. Babineaux v. Black, 396 So.2d 584 (La.App. 3 Cir.1981); Williams v. General Motors Corp., 93-287 (La.App. 4 Cir. 2/11/94), 639 So.2d 275, writ denied, 94-1898 (La.11/11/94), 644 So.2d 387, 388; Johnson v. Department of Pub. Safety, 627 So.2d 732 (La.App. 2 Cir.1993), writ denied, 94-403 (La.4/4/94), 635 So.2d 1107; Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5 Cir.1984). However, this presumption does not apply when a reasonable explanation exists for the failure to produce the evidence. Babineaux, 396 So.2d 584; Morehead v. Ford Motor Co., 29,399 (La.App. 2 Cir. 5/21/97); 694 So.2d 650, writ denied, 97-1865 (La.11/7/97); 703 So.2d 1265; Randolph, 646 So.2d 1019; Bourgeois, 458 So.2d 167.
The Sheriff does not dispute the radio tapes and documents prepared by Deputy McIntosh were lost and/or destroyed. He urges, however, a reasonable explanation exists for his failure to produce the tapes and documents. As the Sheriff explained, the tapes were reused "in the regular course of business" because "they are so expensive" and the report prepared by Deputy McIntosh was not a report at all: The deputy simply "spoke with Donald Handy, made some notes, and then returned to the Sheriff's Office where he then copied his notes into statement form."
La.R.S. 44:1(A)(2) requires the Sheriff to preserve "all ... records, writings ... letters... tapes, recordings, memoranda, and papers ... or any other documentary materials, regardless of physical form or characteristics... having been used, being in use, or prepared, possessed, or retained for use in the conduct, transaction, or performance of any business, transaction, work, duty, or function which was conducted, transacted, or performed by or under the authority of the constitution or laws of this state, or by or under the authority of any ordinance, regulation, mandate, or order of any public body... [which] are `public records'...." La. R.S. 44:36(A) provides: "All persons and public bodies having custody or control of any public record ... shall exercise diligence and care in preserving the public record for the period or periods of time specified for such public records in formal records retention schedules developed and approved by the state archivist and director of the division of archives, records management and history of the Department of State." In instances where "a formal retention schedule has not been executed, such public records shall be preserved and maintained for a period of at least three years from the date on which the public record was made."
Shannon Daughenbaugh, Assistant Supervisor of Communication for the Sheriff's Department, testified at least four radio frequencies and all incoming phone lines are recorded on Dictaphone tapes. The tapes (reels) record up to 25 hours each and are marked beginning with the number 1, for the first day of the month, and the remainder are marked in numerical sequence for each succeeding day of the month, until the end of the month when they are renumbered and reused the next month. The reels cost $155 eacha cost the Sheriff insists is too great to *1132 require him to purchase and maintain a tape each day for a period longer than 30 days. Yet, the Sheriff has not requested approval by the State Archivist or the Director of Archives to institute a shorter "formal retention schedule" for the radio tapes. Instead, he has unilaterally "kept in place for years a practice" of destroying public records which violates the express mandate of R.S. 44:1, et seq.[7] We simply cannot accept as reasonable the Sheriff's explanation for destroying the radio tapes under the circumstances, particularly noting Shannon also testified "important parts" of the "big tape" had been recorded on "small tapes" in the past for preservation when "[relating] to an investigation or whatever."
Neither are we persuaded by the Sheriff's argument that the availability of the CAD reports and the live witnesses renders moot plaintiffs' contention that they were prejudiced by the lost or destroyed radio tapes and documents prepared and collected by Deputy McIntosh. Shannon admitted the CAD reports[8] did not reflect all of the communication recorded on the tape. And, the statements contained the fresh, immediate recollections of the eyewitnesses' who all admitted at trial the lapse of time made it difficult for them to recall the exact times and sequence of events on the night of the accidents. It matters not whether Deputy McIntosh's "writing" was a note copied into "statement form," it also was a public record; and, so too, were the witnesses' statements. The Sheriff breached a statutory duty to exercise diligence and care in preserving them. The "note" and statements were relevant, material, and may have been beneficial to the triers of fact in their search for the truth, particularly noting the occurrence and sequence of events preceding the second accident were vehemently contested at trial.

II. Cause-in-Fact
Sphere Drake and the Sheriff argue plaintiffs "failed to establish the requisite cause-in-fact relationship between the alleged conduct of the unidentified sheriff's deputies and the risk incurred by Jaymie Edwards." The evidence, they contend, failed to show even if the sheriff's deputies had acted in a different fashion, it is more probable than not that Jaymie's injuries would not have occurred. They insist "common-sense" tells us the result would not have changed even if deputies would have stopped and taken control of the accident scene. The "intervening conduct of Daugherty," who was intoxicated, speeding, and inattentive, they maintain would have resulted in an accident occurring nevertheless. They argue, further, the alleged omitted conduct by the deputies was in fact supplied by Handy, who took charge of the accident scene, and still the accident occurred. Were we to frame the issues, as the defense suggests, we too might possess sufficient "common sense" to find merit in their position. But the real cause-in-fact inquiry we are compelled to make in this case is more narrow in scope: It does not require *1133 us to decide affirmatively whether the second accident would have occurred regardless. And, we agree Daugherty's conduct, in operating his vehicle while intoxicated, inattentive and at an excessive rate of speed, was a cause-in-fact of the injuries Jaymie sustained. But "there can be, and frequently is, more than one cause-in-fact of [a] tort victim's injuries." Syrie, 693 So.2d at 1179 (dissenting opinion). Plaintiffs alleged the deputies were negligent: (1) In failing to stop and take control of the accident scene; and (2) in failing to take steps to remove Jaymie from a position of peril. Stated differently, they maintain: Had the deputies stopped and taken control of the accident scene, the injuries suffered by Jaymie Edwards would not have occurred because he would have been removed from the "zone of danger." Our courts have held, on more than one occasion, when a law enforcement officer becomes aware of a dangerous traffic situation, he has an affirmative duty to see that motorists, as well as, pedestrians are not subjected to unreasonable risks of harm. Syrie, 693 So.2d 1173; Blair, 621 So.2d 591; Monceaux, 590 So.2d 672; Curry, 405 So.2d 1387. The Sheriff is not seriously suggesting that his officers had no duty. Rather, he argues even if they had stopped, nothing would have happened differently in this case. But, this argument defies good sense because it presupposes that the officers had no duty to do anything more than Handy did to secure the accident scene and they would have allowed Jaymie to continue standing in harm's way. But the latter, the evidence proves, would not have happened and the deputies, in properly performing their duty, were required to do more. As Deputy Mefford acknowledged, to "secure the scene" of an accident, a deputy would normally "position [his] unit in a location" where its red lights can be seen, and the unit can serve as a "block or like some sort of barrier between the oncoming traffic and the incident." When asked "you don't let civilians do the work of law enforcement, do you [when you take control of the scene]," Mefford replied "no." William Katsarsis, an expert in the area of police practice and procedures, also testified:
Q: Now. Is it your opinion that the injuries to Jaymie Edwards would not have occurred if the sheriff deputy had stopped and secured that scene?
A: Yes. He wouldn't have been on the roadway. The deputy would have taken control of the scene, the patrol car would have been at the southern most portion with the car at the northern portion of the scene, and the deputy would have been choreographing the cars coming and going on the two lanes until he or she could get some additional help. Mr. Edwards wouldn't have been on the roadway. And that's the reason why the misconduct is so important to determine.
The cause-in-fact issue, correctly framed, is whether Jaymie would have been injured had the officers taken proper control of the accident scene. By their own admission, he would not have been in the "zone of danger" and he would not have been a tort victim. We cannot say the trial judge or jury committed manifest error in concluding the deputies' failure to stop and take control of the accident scene was a cause-in-fact of Jaymie's injuries.[9]

III. Breach of Duty and Scope of Protection
Both Sphere Drake and the Sheriff argue the injuries sustained by Jaymie were not within the scope of protection of the duty imposed on the deputies to control the accident scene. They contend the ambit of the deputies' duty did not "extend to the harm sustained by [Jaymie] who had placed himself in a position of peril when he was hit by a speeding, and grossly intoxicated driver." Although conceding law enforcement officers have a duty to protect pedestrians, as well as motorists, this duty they urge attaches only "if an officer is already directing traffic." The Supreme Court, however, has stated from the moment a law enforcement *1134 officer becomes aware of a dangerous traffic situation, he has an affirmative duty to protect life and limb and to see that motorists and pedestrians are not subjected to unreasonable risks of harm. Syrie, 693 So.2d 1173. While the scope of an officer's duty to act may "not extend so far as to require that the officer always choose the `best' or even a `better' method of approach," the failure to approach at all is negligence per se. Id. at 1177. Had the officers done so in this case, they would have been duty bound to control the accident scene and to remove Jaymie from the very risk he ultimately incurred: That an inattentive, drunk driver might not stop in time to avoid causing yet another accident.
We also have read with great interest counsel for Sphere Drake's ruminations on this issue and taken in account each of the policy considerations he urges that we should make in this case. Suffice it to say, here, the Legislature and our courts have answered many of the questions he encourages us to revisit. The occurrence of the second accident was not so unexpected, unusual, or unforeseeable that we should depart from well settled jurisprudence and venture on a new policy course.[10] The deputies in this case had a duty to protect Jaymie and to remove him from harm's way. For us to deny him recovery, nevertheless, for the severe injuries he sustained as a result of the deputies' breach of this duty requires that we ignore the holdings in Curry, Blair, Monceaux, Duvernay, Syrie, and a litany of cases preceding and following them. We believe the better course here is to follow the path already traveled.

IV. Apportionment of Fault
The Sheriff argues the trial court did not consider whether the actions of Donald Handy or Jaymie Edwards constituted negligence. As a general rule, where a judgment is silent with respect to any demand which was at issue in the case under the pleadings such silence constitutes a rejection of that demand. Sun Fin. Co., Inc. v. Jackson, 525 So.2d 532 (La.1988); Montgomery v. Lafayette Parish Sch. Bd., 95-1613 (La.App. 3 Cir. 7/3/96), 677 So.2d 162, writ denied, 96-2035 (La.11/8/96), 683 So.2d 274; Bankers Trust of Louisiana v. Smith, 629 So.2d 525 (La.App. 5 Cir.1993); writ denied, 94-0124 (La.3/11/94), 634 So.2d 393.

A. Fault of Donald Handy
The Sheriff does not argue Donald Handy was negligent in assuming the task of directing traffic. Rather, he contends Handy's method of directing traffic was negligent. He suggests once Handy took charge of the accident scene, proper procedure required him to remove the obstructing vehicles from the roadway. Had Handy taken this course, the Sheriff suggests, the second accident would not have occurred; thus, Jaymie would not have been injured. He cites La.R.S. 32:141 and Wood v. May, 94-756 (La.App. 4 Cir. 12/15/94), 647 So.2d 1265, as support for his position. We note La.R.S. 32:141 places a duty only upon the operator of a motor vehicle to move a vehicle from a highway. In addressing the responsibility this provision imposes on motorists, the fourth circuit held:
LSA-R.S. 32:141 allows for the possibility that a disabled vehicle may sometimes have no choice but to stop on the highway. But the statute requires that the driver of even the disabled vehicle "... shall remove it as soon as possible, and until it is removed it is his responsibility to protect traffic."
Donald Handy was not a motorist involved in this case; and the statute imposed no duty upon him to protect traffic until the vehicles were removed. Even if Donald Handy's method of directing traffic was not the most prudent or in accord with "proper procedure," his alleged misconduct was not a cause-in-fact of Jaymie's injuries.[11] Had the deputies stopped and taken steps to secure the scene, they could have removed the vehicles and Jaymie from the path of the intoxicated *1135 motorist before the second accident occurred.[12]

B. Fault of Jaymie Edwards
The Sheriff also asserts the trial court failed "to assign any degree of comparative fault to the plaintiff, who voluntarily placed himself in a position of grave peril, and who failed to keep a proper lookout." Contributory negligence must be determined objectively according to the standard of the conduct expected of a reasonable man under like circumstances. Buckbee v. Aweco, Inc., 614 So.2d 1233 (La.1993); Smolinski v. Taulli, 276 So.2d 286 (La.1973). The defendant has the burden of proving contributory negligence.
After reviewing the record, we do not find Jaymie's actions were unreasonable. An accident had just occurred which was obstructing traffic. Fearing another accident, and noticing Donald Handy was directing traffic alone, Jaymie offered assistance. The Sheriff asserts Jaymie acted unreasonably in turning his back and not watching the lane of traffic he was controlling. Jaymie's failure "to take every precaution against every foreseeable risk or to use extraordinary skill, caution and foresight does not constitute negligence or contributory [comparative] negligence." Jones v. Trailor, 93-2144, p. 3 (La. App. 4 Cir. 4/28/94), 636 So.2d 1112, 1115, writ denied, sub. Nom. Rome v. Traylor, 94-1337 (La. 9/16/94), 642 So.2d 193, citing Smolinski, 276 So.2d 286. And, just as the court found in Curry, Handy's position proved perilous because the deputies failed to take control of the scene and the drunk driver failed to see what he should have seen. We cannot say the trial judge erred in failing to assign him any fault in causing his injuries.

C. Fault of The City of Westlake and Officer Henry Simms
The Sheriff asks this court to assess fault to the City of Westlake because its officer, Henry Simms, passed through the accident scene without rendering assistance. Plaintiffs agree that Officer Simms passed the accident scene and did not stop. However, it is undisputed that the location of the accident scene was out of the territorial jurisdiction of the City of Westlake.
At trial, plaintiffs filed a Motion in Limine to exclude consideration of the City of Westlake's alleged fault. The trial court granted the motion, and the Sheriff sought review by this court. Citing Hayes v. Parkem Industrial Services, Inc., 598 So.2d 1194 (La.App. 3 Cir.1992), writ granted, 608 So.2d 154 (La. 1992), writ dismissed, 610 So.2d 825 (La. 1993), this court found "no error in the trial court's ruling." While acknowledging our previous ruling, the Sheriff asks us to reconsider it. This court in Hayes, 598 So.2d at 1197 stated:
If a sheriff's jurisdiction and authority to act is limited to his parish, it stands to reason that he has no jurisdiction or authority to act outside his parish. It follows that if he has no authority to act outside his parish, he has no duty to act outside his parish. As to the plaintiffs in the present case, the sheriff's duty was no greater than that of a lay person.
Likewise, it stands to reason if the Westlake police officer had no jurisdiction nor authority to act outside the borders of the city limits, he had no duty to affirmatively act in this instance. The Sheriff does not cite any authority to support his contention that Officer Simms assumed a greater duty when he "left his jurisdictional boundary" and traversed the accident scene. This issue has been considered; and we are satisfied our earlier ruling is legally sound.

D. Allocation of Fault Between the Sheriff and Edward Daugherty
The trier of fact has the task of allocating fault and must consider the nature of the conduct of each party and the extent of the causal relationship between the conduct and the damages sustained. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985); Hi-Tech Timber Co., Inc. v. Valley *1136 Elec. Membership Corp., 94-1033 (La. App. 3 Cir. 2/1/95), 649 So.2d 1203, writ denied, 95-568 (La.4/21/95), 653 So.2d 571. The trial court found the Sheriff was 55% and Daugherty 45% at fault in causing the accident. However, the jury assigned the Sheriff only 32.5% fault in causing Jaymie's injuries; assessing the balance, 67.5%, against Daugherty for his contributory fault.
In reaching his apportionment, the trial judge emphasized the deputies' duty to intervene and take control of the accident scene:
So, in view of these cases and taking into consideration that the very reason why a deputy should stop and take control at the scene is to prevent the very thing that happened in this case, to prevent a person being injured by a drunk driver, or a driver not obeying the laws and not paying attention.
It is undisputed that the negligence of Daugherty in operating his vehicle while intoxicated and at an excessive rate of speed was a substantial factor in causing Jaymie's injuries. But, the trial court found the Sheriff's deputies breached their duty to guard against the very risk that Jaymie ultimately encounteredthat a drunk, inattentive driver might cause him injury if he remained in harm's way. He attributed a higher degree of blame to the Sheriff's deputies in causing the accident. While the record evidence supports the jury's and judge's apportionments, we believe the trial judge's fault assessment was more reasonable, particularly noting the Supreme Court's holding in Campbell v. Louisiana Dept. Of Transp. & Development, 94-1052 (La.1/17/95), 648 So.2d 898. Had the Sheriff's deputies properly secured the scene and removed Jaymie from the "zone of danger," Daugherty's negligent conduct would not have caused the severe debilitating injuries he ultimately sustained. Whether Daugherty's conduct would have caused injury, regardless, to others standing in the danger zone is not germane to our finding. We must address the facts in this particular case involving this particular tort victim.

V. Jury Interrogatory Form
Sphere Drake asserts the trial court erred by not allowing the jury the opportunity to allocate fault to Donald Handy, the City of Westlake or Officer Henry Simms. However, Sphere Drake did not object to the jury interrogatory form in the trial court. And as noted, Sphere Drake even filed a motion requesting that the trial court delete Donald Handy from the verdict form. When a party fails to object to jury interrogatories before the jury retires, the party waives his right to raise the objection on appeal.[13]Sebastien v. McKay, 94-203 (La.App. 3 Cir. 11/23/94), 649 So.2d 711; Horton v. McCrary, 620 So.2d 918 (La.App. 3 Cir.1993), reversed in part on other grounds, 93-2315 (La.4/11/94), 635 So.2d 199. As such, we deem the issue waived and not properly before us. Clay v. International Harvester Co., 95-1572 (La.App. 3 Cir. 5/8/96), 674 So.2d 398.

QUANTUM ASSIGNMENTS OF ERROR

I. General Damages
The Sheriff contends the trial court's award of $800,000 for general damages was grossly excessive and constituted an abuse of discretion.[14] He suggests the highest *1137 amount that reasonably could have been awarded was $400,000. Plaintiffs answered the appeal and assert the award of general damages was inadequate, and ask for a minimum award of $1,000,000 for general damages. Sphere Drake "for the most part" adopts the arguments advanced by the Sheriff on the quantum issues. But, it urges us to consider the trial judge's alleged bias as we review the quantum awards. As noted, we have considered the bias issue and dismissed it as unsupported by the facts in this case and the law.
Our jurisprudence has consistently held, in the assessment of damages, much discretion is left to the judge or jury. Such awards will be disturbed only when there has been a clear abuse of discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Foster v. Town of Mamou, 616 So.2d 837 (La.App. 3 Cir.), writ denied, 620 So.2d 842 (La.1993). Only after articulated analysis of the facts and circumstances peculiar to the particular case discloses an abuse of discretion, may an appellate court amend an award of damages. Reck v. Stevens, 373 So.2d 498 (La.1979). It is not appropriate to resort to a review of prior awards without a prior finding that the trial court abused its discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993).
There is no dispute that Jaymie Edwards suffered severe injuries from the accident. He sustained a severe closed head injury producing a coma that lasted approximately two weeks. He also suffered a severe fracture of his left leg. Jaymie remained hospitalized for a month and was then transferred to a rehabilitation center where he received treatment for more than three months. Through rehabilitation, Jaymie has been retrained to perform simple tasks, such as speaking, walking and eating. For approximately 20 days during October, 1994, Jaymie also was treated as an in-patient at a psychiatric clinic. The weight of the medical testimony indicates Jaymie will require supervision and assistance the remainder of his life.
Defendants emphasized that Jaymie's physical abilities have continually improved since the accident. They introduced a surveillance video showing Jaymie driving a Wave Runner (a jet skisingle occupant water craft) and fishing. Jaymie is capable of performing some physical activities, though the record is clear he sustained permanent weakness is his left side and knee which impairs his ability to walk. The medical evidence also confirms his cognitive abilities have diminished as a result of this accident. He suffers from severe deficits in memory and learning ability. He reads at the level of a third grader and has the math ability of a first grader. He also has severe deficits in his attention and concentration skills. He cannot recall conversations that occurred only minutes beforehand. Dr. Robert Taylor, a physical medicine and rehabilitation specialist, regarding Jaymie's need for lifetime supervision testified:
Q: Now, also I know when we talked to you before you mentioned the need for Jaymie to have some supervision in his life?
A: Correct.
Q: I think you mentioned that you felt like someone needed to actually live with him and supervise him on a daily basis?
A: Correct. I don't think he necessarily needs 24-hour visual or tactile contact or supervision but I think the potential for that needs to be there. You know, he has some severe persistent judgment and insight impairments. I worry more what trouble he can get himself into from a cognitive standpoint leading to physical problems.
Q: When you say from a cognitive standpoint. What do you mean?
A: Well, he has some fairly severe judgment and insight impairments andyou know, just like with the wave runner, you know, if he saw a half submerged log and thought he could jump that log on a wave runner. Things you and I might not consider doing, he might well consider doing.

*1138 Q: Due to his brain injury?
A: Correct.
Q: So he doesn't need someone to watch him or help him take care of his personal hygiene for example, but he does need someone there with him, living with him, to make sure he'sthat he's in a safe environment?
A: Right. Manage his daily affairs and justjust keep a close check on what he plans for himself for a given day.
Q: Would you recommend that Jaymie see someone like yourself on an annual basis?
A: Correct.
Jaymie's mental abilities will not drastically improve, and he will never return to the functional level he possessed prior to the accident. He suffered debilitating injuries that have greatly impaired his enjoyment of life. The trial court's decision to award him $800,000 in general damages was not an abuse of discretion; and, we will not disturb this award by decreasing or increasing it.

II. Future Medical Expenses
The trial court awarded Jaymie $1,045,690 for future medical expenses. Defendants contend this amount is excessive, and plaintiffs contend it is inadequate. We find the record amply supports the trial court's award.
The evidence regarding Jaymie's future medical needs was provided largely by Dr. John Grimes, an expert in the field of rehabilitation counseling. Dr. Grimes testified Jaymie will require routine medical care by physicians for the remainder of his life to prevent any deterioration in his condition. He also testified he will need therapeutic evaluation, physical supplies (wheelchairs, braces, etc.), and possible surgical interventions. In his opinion, Jaymie needs to visit a specialized rehabilitation facility for 3 to 6 months to teach him to live as independently as possible, although Jaymie will require daily supervision for the remainder of his life. How much supervision will depends on the results gained from the training at the specialized rehabilitation facility. According to Dr. Grimes, the best case scenario, would be Jaymie will need 8 hours a day of supervision; and, worst case scenario, he will require 16 hours a day. He estimated to obtain such supervision, Jaymie will have to pay $8 to $8.50 per hour. We note the trial court in his award calculated supervision for 8 hours rather than 16 hours per day. Jaymie's life expectancy was determined to be 39 years. This determination was not disputed.
Future medical expenses by their nature are incapable of precise measurement. Thus, much discretion shall be left to the trial court for the reasonable assessment of those damages. La.Civ.Code art.1999. In Stiles v. K Mart Corp., 597 So.2d 1012 (La. 1992), the Louisiana Supreme Court stated:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La.Code of Civ. Proc. art. 2164.
Based on Dr. Grimes' testimony and our independent review of the record as a whole, we find the trial court's award of $1,045,690 in future medical expenses is the "minimum amount that reasonable minds could not disagree will be required" for Jaymie care and treatment.

III. Lost Earnings
The Sheriff asks this court to reduce Jaymie's awards for past and future loss income. The trial court awarded him past lost earnings of $104,533 and future loss of earnings of $894,312. The Sheriff contends the awards should have been $84,100 for past lost wages and $596,500 for future loss of earning capacity.
Before the accident, Jaymie worked as a pipefitter and welder. At trial, his income during the previous five years before the accident was established. Both sides economists agreed the first year Jaymie worked should be disregarded because it was not *1139 illustrative of his earning potential. Defendants main complaint is the trial court erred in relying on plaintiffs' economist's calculations because his figures were based on the highest year of earnings out of the remaining four years of Jaymie's work history. They contend it was more appropriate to use an average of the remaining four years in determining lost earning capacity.
The Louisiana Supreme Court in Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990) addressed this issue:
While plaintiffs earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Under the circumstances, we cannot say the trial judge legally erred in relying on plaintiffs' economist's calculations. In arriving at a future lost wages award, the trial judge was not restricted to considering "the average wage" earned by Jaymie during the four year period; neither was he prevented from using Jaymie's highest wages to determine his future loss. It was certainly reasonable to conclude that Jaymie's future wages would not have remained the same and, more probable than not, would have increased significantly.
The Sheriff also asserts the trial court erroneously awarded Jaymie a sum for loss of fringe benefits. Fringe benefits are recognized as a proper element of damages. Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97), 696 So.2d 88; Goodwyne v. People's Moss Gin, Inc., 96-1340 (La.App. 3 Cir. 4/30/97), 694 So.2d 1101, writ denied, 97-2041 (La.11/21/97), 703 So.2d 1309; Averna v. Industrial Fabrication and Marine Serv. Inc., 562 So.2d 1157 (La.App. 4 Cir.1990). The Sheriff contends that as a pipefitter, paid on an hourly basis, Jaymie would not have received much in the way of fringe benefits. However, Dr. Bernard Pettingill testified "ninety-nine (99%) percent of all companies pay some benefits." He estimated fringe benefits generally make up between fifteen (15%) percent to thirty-four (34%) percent of an employee's wages. Specifically considering Jaymie's particular job before the accident, Dr. Pettingill selected the bottom figure of fifteen (15%) percent as a fair factor to calculate his fringe benefit loss. Contrary to the Sheriff's assertions we do not find the trial court erred in including loss of fringe benefits in its award. And, we are convinced his overall calculation of Jaymie's lost earnings was not an abuse of discretion.

IV. Loss of Consortium
The trial court awarded $150,000 to Jennifer Edwards and $100,000 each to Janet Edwards and Jaymie Edwards, II, for loss of consortium. In making this award the trial court concluded that "for all practical purposes they have lost their dad."
Dr. Frank Lopez, a doctor of physical medicine and rehabilitation, testified regarding the deterioration in the father-child relationship between Jaymie and his minor offsprings. He stated in particular:
Q: So it would not surprise you if Mr. Edwards was unable to continue a relationship with his children ...
A: No. I wouldn't be surprised at all. He wouldn't be able to tolerate being beside the children. Plus, he would be harder to deal with than the children themselves.
Q: Jaymie would be harder to deal with than the children?
A: Yes, in that environment.
Q: I think you even described itlooking at my notes is a situation where the wife cannot take care of three children, and one child [Mr. Edwards] that does not understand anything.
A: Several of them are growing up and learning, and the other one [Mr. Edwards] who stays at the same level all the time.
*1140 The evidence revealed the relationship between Jaymie and his children has been irreparably damaged. In particular, Jennifer Edwards, who enjoyed a very close relationship with her father, has been especially affected by his condition. Dr. Richard Austin, a clinical psychologist who treated Jennifer, testified she suffered from depression, severe concentration problems and low self-esteem, all related to Jaymie's injuries. Dr. Austin felt as a result of their father's injuries, all three of the Edwards children, especially Jennifer, will experience continued emotional problems. We agree with the trial court, that for all practical purposes, these children have been deprived of their father. The defendants' argument that the trial court abused his discretion in making the loss of consortium awards is completely without merit.

SPHERE DRAKE'S POLICY LIMIT
The trial court entered judgment in favor of plaintiffs and against Sphere Drake in the amount of One Million Seven Hundred Fifty-Six Thousand Twenty-Two and 50/100 (1,756,022.50) Dollars, subject to Sphere Drake's policy limits. Plaintiffs argue the judgment rendered against Sphere Drake should be amended to award them Sphere Drake's policy limits of One Million ($1,000,000.00) Dollars. Sphere Drake argues its policy is an aggregate policy with a limit that steadily decreases as claims for payments from other Louisiana sheriffs are paid during the policy year. Thus, Sphere Drake contends any judgment against it must contain the wording: "subject to its policy limits."
The Sphere Drakes policy limits is One Million ($1,000,000.00) Dollars per claim, above self-insured retention levels of the Louisiana Sheriff's Risk Management Program. The policy covers sums "that the insured becomes legally obligated to pay as damages because of bodily injury ... caused by any person whilst acting within the course and scope of their employment by the insured."
Responding to plaintiffs' contention, Sphere Drake presented the testimony of Luther Mount, a claims adjuster for the Louisiana Sheriff's Risk Management Program, regarding certain alleged expenditures deducted from the policy limit during the relevant period. Mr. Mount testified that an individual associated with Sphere Drake informed him that approximately Seven Hundred Fifty Thousand ($750,000.00) Dollars of coverage remained on the policy issued by Sphere Drake to Sheriff McElveen. Plaintiffs objected to Mr. Mount's competency to testify, arguing he had no personal knowledge to render testimony regarding the policy amount available or remaining for satisfaction of the judgment against Sphere Drake. Sphere Drake offered no evidence, except Mount's estimation to prove the policy limit was less than $1,000,000.00.
Addressing plaintiffs' concern, the trial judge noted Lloyds of London, as the Sheriff's excess insurer, is obligated to pay "another million dollars" to satisfy the judgment. Counsel for Sphere Drake stipulated on the record that at least $750,000.00 of its policy limits was available to satisfy a portion of the $1,756,022.50 judgment against the Sheriff. The trial judge cautioned that he was "not going to allow the insurance company to go and write off costs to reduce that [$750,000.00]." If Sphere Drake fails to pay its policy obligation, the trial judge retains authority to enforce the judgment cast against it. We deem it premature to entertain plaintiffs' fear that Sphere Drake will not fully honor its contractual undertaking or that it will attempt to exhaust the available policy limit to avoid satisfying their claims. Plaintiffs are not without a remedy.

DECREE
For the foregoing reasons, we affirm the trial court's Judgment Notwithstanding the Verdict in all respects, except that portion affirming the jury's allocation of 32.5% fault against the Calcasieu Parish Sheriff and 67.5% fault against Edward Daugherty. We amend this portion of the judgment to harmonize the jury's fault assessment with the trial judge's and hereby cast the Sheriff with 55% fault and Daugherty with 45% fault. All costs of this appeal are assessed to defendants-appellants.
AFFIRMED, AS AMENDED.
NOTES
[1] Art. III, § 12(A) provides in pertinent part:

Prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law:
* * *
(3) concerning any civil or criminal actions...
[2] However, we also have said before conducting a de novo review, this court will accord deference to the factual findings of the judge and jury and attempt to harmonize inconsistent results. Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3 Cir.1987), writ denied, 522 So.2d 562, 563 (La. 1988). See also Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658; Thornton v. Moran, 348 So.2d 79 (La.App. 1 Cir.), writ denied, 350 So.2d 897 (La.1977).
[3] We noted in Ourso, supra, at FN1, that the fourth circuit has criticized our reasoning, recommending in McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4 Cir.), writ denied, 595 So.2d 655 (La.1992) that appellate courts "make an independent evaluation of the record if the factual findings of the trial judge and the jury are inconsistent."
[4] Recognizing "the courts of appeal have adopted varying procedures for reconciling conflicting decisions by the jury and the judge in bifurcated trial," the Supreme Court nevertheless in Powell v. Regional Transit Authority, 96-715, p. 7 (La.6/18/97), 695 So.2d 1326, 1330, failed to reach the question of "whether to overrule [Thornton v. Moran, 348 So.2d 79 (La.App. 1 Cir.), writ denied, 350 So.2d 897 (La.1977)] mandate to reconcile conflicting decisions rather than to give due deference to each or of how to reconcile the decisions if it is necessary to do so." The second and fourth circuits have held the proper standard is a de novo review of the record, without according any weight or deference to the factual findings of the judge or jury. However, this circuit, joined by the first circuit, has adopted a different standard of review. Like the first circuit in Thornton, we too have sought to harmonize inconsistent judge and jury verdicts by examining both to determine which is more reasonable. Hasha v. Calcasieu Parish Police Jury, 94-705, (La.App. 3 Cir. 2/15/95), 651 So.2d 865; Hatcher v. State Department of Transportation and Development, 478 So.2d 774 (La.App. 3 Cir.), writ denied, 479 So.2d 923 (La.1985).
[5] As noted in Blair, 621 So.2d at 596, "La. R.S. 32:2 sets out the authority of the Department of Transportation and Development and states in pertinent part: ... `promulgate rules and regulations not inconsistent with this Chapter and the general laws relative to highways and their construction, maintenance, and use, and the operation of vehicles and pedestrians thereon ...' (emphasis added). La.R.S. 32:1(81) defines traffic to include pedestrians."
[6] Mr. Rooney Woodard's deposition was read to the jurors, after the judge revealed he passed away prior to trial.
[7] The defense directs our attention to the expert testimony of W.H. Bieck who stated all the police departments that he either worked for or was familiar with in the State of Texas recycled radio tapes. This may be so, but Louisiana's statutory requirements, to the extent they conflict with the "internal practices or customs" of the Calcasieu Parish Sheriff's Department, primes.
[8] The CAD reports, as we gather, are limited handwritten transcriptions of portions of the deputies' radio communication routed through five frequencies monitored by the Calcasieu Parish Sheriff's Department. The reports (logs) are styled "Daily Incident Calls" and reflect the date, time, reporting deputy, complainant, and location of an incident. As deputy Shannon Daughenbaugh explained in response to questioning:

Q. And so, I notice, thatand again I want to make sure I understand, what the log isthe log represents them calling and saying, `This is unit 5,' or whatever, and `I'm stopping to investigate an accident at Davis and Maguire,' or whatever, and so when he makes that call you or your people in the radio room write that down?
A. Correct.
Q. It's also being taped?
A. Correct.
Q. And then when unit 5 leaves, they call back in and they say, `I'm finished, I'm back on patrol.' And that gets logged?
A. Correct.
Q. That's the only thing that is on the logs, correct?
A. Correct.
Q. So, if they don't stop, and they drive through an accident scene or they're just patrolling around and they're not getting out or stopping or doing anything, they wouldn't call it in would they?
A. No.
[9] The defense also complains that the jury form was deficient because it supposedly combined the elements of cause-in-fact and risk-inclusion. Defendants argue "there should have been a separate question directed at [the cause-in-fact] issue alone." The defendants' argument, however, presents nothing for us to revieweven they admit the form complied with the requirements of La.Code Civ.P. art. 1812, though "barely" in their opinion.
[10] Although we have noted the occurrence of the third accident, while the ambulance was transporting Jaymie to the hospital, was hard to fathom, the second was not.
[11] Whether Donald Handy's alleged duty lessened his status as a rescuer also is not a question we need address.
[12] We also note the Sheriff filed a third party claim against Donald Handy; but he opted to dismiss this claim at the close of trial before submission to the jury. Further, on motion of Sphere Drake, Handy was deleted from the jury verdict form. The defendants' actions, thus, prevented the jury from considering any fault Handy may have had in causing the accident.
[13] In a footnote, Sphere Drake alleges it "submitted on November 13, 1996, on the eve of the then scheduled trial, a jury verdict form seeking allocation of fault to six different actors, including Handy, Simms and the Louisiana State Police; and an alternative form with the same six actors at another place on the form." But, for some "inexplicable" reason, Sphere Drake says, "this submission does not appear in the record." Yet, Sphere Drake did not seek by stipulation between the parties or by motion filed with the trial court to supplement the record with the alleged filings. We are prevented from considering its bare-boned allegation in brief which remains unsupported by the record evidence.
[14] The jury failed to award Jaymie any general damages. The trial judge found the jury's failure was clear legal error; and, he granted JNOV awarding Jaymie general damages, which included $400,000 for pain and suffering and $400,000 for loss of enjoyment of life. While Sphere Drake acknowledges the courts have held an award of special damages without a general damage award constitutes error, it posits that this rule's "pedigree may be doubtful." This may be so, but it is now well settled; and, we find no reason in this case to disturb it. We have said often when the jury commits this legal error, it is our responsibility to examine the record de novo and to enter the award accordingly. Sphere Drake's argument that we should take into account the jury's failure to make any award again urges us to override well settled jurisprudence. Finally, Sphere Drake's circuitous and rather confusing argument regarding the "loss of enjoyment of life" award may be fodder for thought, but it is totally without legal merit in this case.